**Delfin P. HAMAD, M.D., Plaintiff**

v.

**NASSAU COUNTY MEDICAL CENTER, and Jerald C. Newman, Ralph Ger M.D., Joan McInerney M.D., David Westring M.D., Joseph R. Erazo, in their official capacity and individually, Defendants.**

No. 98–CV–4320 (JS).

United States District Court,
E.D. New York.

March 20, 2000.

Opinion Granting Reconsideration
in Part Dec. 13, 2000.

L. Lynette Sarno, Thurm & Heller, LLP, New York City, for Plaintiff.

Stewart J. Epstein, Snitow & Cunningham, LLP, New York City, for Defendants.

## MEMORANDUM & ORDER

SEYBERT, District Judge.

Pending before the Court is the defendants' motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint.

## PROCEDURAL BACKGROUND

Plaintiff Dr. Delfin P. Hamad ("Dr. Hamad" or "Plaintiff") commenced the instant action alleging violation of his constitutional rights to due process and equal protection in connection with the termination of his employment and denial of operating room privileges at the Nassau County Medical Center ("NCMC"). Plaintiff's claims are predicated upon (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e*, et seq.; (2) the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. §§ 621*, et seq.; (3) the New York Human Rights Law § 292, et seq. ("NYSHRL"); (4) the Fifth and Fourteenth Amendments of the United States Constitution; (5) Article 1, Section 6 of the New York State Constitution; (6) *42 U.S.C. §§ 1981* and 1983; and (7) the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001*–1462.

Pending before the Court is the motion of defendants, NCMC, Nassau County, Jerald C. Newman, Ralph Ger, M.D., Joan McInerney, M.D., David Westring, M.D., and Joseph R. Erazo (collectively referred to herein as the "Defendants"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint.

In addition, the Court is in receipt of Defendants' request to supplement the above motion with documents relating to the settlement and proceedings before the Office of Professional Misconduct, and to convert the present motion to a motion for summary judgment. The Court has reviewed the defendants' request and the plaintiff's opposition thereto, and denies the request. Following receipt of the ruling below, Defendant is directed to contact the Court in order to schedule a premotion conference in accordance with my Individual Rules.

## FACTUAL BACKGROUND

Dr. Hamad is a United States Citizen of Filipino descent who began working for NCMC in 1975 at the approximate age of 40. (Amended Complaint ("Cplt.") PP 5, 6, 17). Dr. Hamad began his twenty-one year employment at NCMC as a voluntary attending in surgery. (Cplt. P 16). From 1975 through May 1996, Dr. Hamad was a full-time physician in the surgical emergency room of NCMC. (Cplt. P 17). During this period Dr. Hamad performed vascular and laparoscopic surgery without incident. (Cplt. P 18). The Chief of the Surgical Department knew that Dr. Hamad was given the responsibility of handling vascular and laparoscopic surgeries. (Cplt. P 18).

On or about January 15, 1996, Dr. Hamad submitted a request for additional clinical privileges, including privileges for certain vascular access procedures and a laparoscopic procedure. (Cplt. P 19). In May 1996, Dr. Hamad wrote a letter to defendant Dr. Ralph Ger, the Acting Chair of the Department of Surgery, requesting permission to attend emergency on-call cases so that Dr. Hamad could attend surgeries on an as-needed basis. (Cplt. P 20). In response to the request, Dr. Hamad was given the responsibility to attend surgeries on an as-needed basis. (Cplt. P 21). Dr. Hamad did not receive compensation for such services. (Cplt. P 20).

Thereafter, on June 24, 1996, Dr. Hamad received a letter from Jerald C. Newman, President of the Board of Managers of NCMC. (Cplt. P 22). The letter informed Dr. Hamad that he was being reappointed to the staff of NCMC as an attending in the Division of General Surgery, Department of Surgery. *Id.* This reappointment process was done bi-annually. (Cplt. P 23). Subsequently, Dr. Hamad's name began to appear on the surgical schedules for vascular and general

surgical cases. *Id.* Thereafter, Dr. Hamad's name continued to appear on the surgical on-call schedule for June, July, August, and September of 1996. (Cplt. P 25). These schedules were prepared by the Department of Surgery under the supervision and direction of the Director of Surgery, who selected and scheduled Dr. Hamad for the surgeries he performed. *Id.* During this time period Dr. Hamad openly performed eleven laparoscopic surgeries with residents of NCMC without complaint. (Cplt. P 26).

On or about October 2, 1996, Dr. Hamad met with Dr. Ger regarding the possible suspension of Hamad's privileges. (Cplt. P 28). At that meeting, Dr. Ger. informed Dr. Hamad that he could not have vascular privileges at NCMC, and it was questioned whether Dr. Hamad had the privileges to carry out general surgery. *Id.*

On October 18, 1996, Dr. Ger notified Dr. Hamad that his privileges were being "removed immediately" and "unjustifiably accused" Dr. Hamad of performing laparoscopic surgery and vascular surgery without being privileged to carry out these procedures. (Cplt. P 29). Thereafter, Dr. Hamad remained at NCMC but could no longer perform elective surgical privileges in the operating room. (Cplt. P 30).

On December 24, 1996, defendant Dr. Joan McInerney, Chair of the Department of Emergency Medicine at NCMC, notified Hamad that he was suspended without pay from his position as a surgical attending in the Emergency Department. (Cplt P 33). On that same day, defendant David Westring, Medical Director of NCMC, notified the New York State Department of Health, Office of Professional Medical Conduct, that Dr. Ger had denied all operating room privileges to Dr. Hamad. (Cplt. P 31). Defendants filed a report with the New York State Department of Health regarding Dr. Hamad's suspension

of privileges on January 9, 1997. (Cplt. P 32).

Subsequently, on January 9, 1997, defendant Joseph R. Ezaro, then Executive Director and Chief Executive Officer of NCMC, wrote to Dr. Hamad advising him that his employment was terminated at NCMC (Cplt. P 34). Furthermore, Dr. Hamad was informed that his professional privileges at NCMC were withdrawn because he performed several surgical procedures without the requisite privileges. *Id.* Dr. Hamad was sixty-three years old and one year shy of having his pension vested when NCMC terminated his employment. (Cplt. P 35).

Following his termination, Dr. Hamad requested that a hearing be held by his peers at NCMC, pursuant to NCMC By–Laws, to determine whether his termination was proper. (Cplt. P 38). A "so-called 'hearing' " was commenced on April 9, 1997, before a Committee of four doctors from various departments within the hospital and a chairperson of the Ad Hoc Committee. (Cplt.39). Both Dr. Ger and Dr. Hamad testified at the hearing. *Id.*

On April 23, 1997, before the hearing was concluded, defendant Dr. David Westring, Acting Medical Director of NCMC, filed a report with the National Practitioner Data Bank. (Cplt. P 40). This complaint notified all hospitals and medical doctors of the termination of Dr. Hamad's clinical privileges and employment at NCMC based upon Dr. Hamad's "performance of laparoscopic surgery and vascular surgery at Nassau County Medical Center without privileges." *Id.* Thereafter, the hearing continued on June 29, 1997, at which time Dr. Hamad was denied permission to call two witnesses: Dr. Joan McInerney and an outside expert on granting physician's surgical privileges, in violation of NCMC By–Laws, Art. 8 § 2(d)(10) and (11), (Cplt. P 41).

On July 1, 1997, the Ad Hoc Committee Chairperson, Dr. Lynn Weiss, issued a memorandum decision on the hearing which stated, that "Dr. Hamad on two (2) occasions performed elective surgery for which he was not appropriately credentialed." (Cplt. P 42). On September 22, 1997, Dr. Hamad appealed to the NCMC Board of Managers pursuant to NCMC By–Laws Art. 8, § 2(c)(7) for its failure to allow the testimony of the two witnesses. (Cplt. P 43).

On October 8, 1997, after appellate argument before the Board of Managers, a decision was rendered allowing Dr. Hamad to call defendant Dr. Joan McInerney as a witness and allowing the outside expert to testify as to all relevant issues raised regarding Dr. Hamad's complaint. (Cplt. P 44).

Thereafter, Dr. Hamad requested to be reinstated to his former position as surgical attending in the Emergency Department at NCMC and that his surgical privileges be reinstated because, as acknowledged by the Board of Managers, Dr. Hamad's due process rights had been violated at the initial hearing. *Id.* Although a subsequent hearing was scheduled for March 1998, that hearing was never commenced "as a result dilatory tactics by NCMC." (Cplt. P 46). Dr. Hamad further asserts that NCMC refused to pay for his accrued vacation and sick days, totaling $48,824.22. (Cplt. P 47).

Upon his termination, Dr. Hamad was replaced by a younger Caucasian male. (Cplt. P 48). In addition, at the time of termination Dr. Hamad was the oldest full-time physician in the Emergency Room. *Id.* Dr. Hamad claims that he was the only person of color in the Department of Surgery and, despite allegations of misconduct and malpractice, other Caucasian physicians in the department were not subjected to adverse employment decisions. (Cplt. P 50).

Subsequently, Dr. Hamad filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and a right to sue letter was issued on or about March 20, 1998. (Cplt. P 51).

## DISCUSSION

### I. STANDARDS GOVERNING A 12(B)(6) MOTION TO DISMISS

A district court should grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)); *Annis v. County of Westchester, N.Y., 36 F.3d 251, 253 (2d Cir.1994).*

In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *H.J. Inc.* at 249, 109 S.Ct. at 2906; *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth.,* 23 F.3d 636, 639 (2d Cir.1994); see also *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (citing Fed.R.Civ.P. 8(a)(2) to demonstrate liberal system of 'notice pleading' employed by the Federal Rules of Civil Procedure).

The court's duty merely is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); accord *Goldman v. Belden,* 754

F.2d 1059, 1067 (2d Cir.1985). The appropriate inquiry, therefore, is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 124 (2d Cir.1991) (plaintiff is not compelled to prove his case at the pleading stage).

Additionally, it is not required that a claimant set out in detail the facts upon which he or she bases a claim, but only a statement of his or her claim that will give defendant "fair notice of what [the] claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Therefore, where a complaint is filed that charges each element necessary to recover, dismissal of the case for failure to set out evidential facts can seldom be warranted. *U.S. v. Employing. Plasterers Ass'n of Chicago*, 347 U.S. 186, 188–89, 74 S.Ct. 452, 98 L.Ed. 618 (1954). Individual allegations, however, that are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains are meaningless as a practical matter and, as a matter of law, insufficient to state a claim. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987).

## II PLAINTIFF'S TITLE VII AND ADEA CLAIMS

The Second Circuit informs that the same analysis applies when assessing the sufficiency of Title VII and ADEA claims on a motion to dismiss. *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998) (citing *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994)). In order to set forth a prima facie case under either statute, the claimant must demonstrate "(1) membership in a protected class/ age group; (2) qualification for the position; (3) an adverse employment decision/discharge; and (4) that the decision/ discharge took place under circumstances giving rise to an inference of discrimination." *Id.*; see also *Woroski*, 31 F.3d at 108. Furthermore, "the requirements for establishing a prima facie case are 'minimal.' " *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); see also *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997), cert. denied, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

It is undisputed that Plaintiff has satisfied the first and third prongs of the analysis. (See Defendants Memorandum of Law in Support of Motion to Dismiss ("Def.'s Memo.") at 8). Thus, the Court's analysis shall focus on the second and fourth elements of the claims.

1. Second Prong—Qualified for Employment

Defendants argue that Plaintiff has failed to allege facts suggesting he was qualified for employment. Moreover, Defendants maintain that Plaintiff "does not and cannot deny that he performed laparoscopic and/ or vascular surgeries without being privileged to do so." (Def.'s Memo. at 12). These arguments, however, fall short when compared to the allegations raised in the pleadings.

First, the pleadings set forth Plaintiff's medical training in the areas of cardiovascular laparoscopic surgery. Specifically, paragraphs 14 and 15 of the Amended Complaint state that Plaintiff:

completed Cardiovascular and Thoracic training at St. Francis Medical Center from 1966–1967 and 1968–1970, at New York Medical college from 1967–1968, and the American College of Surgeons in 1993. Dr. Hamad underwent a preceptorship in laparoscopic surgery, and performed a number of laparoscopic surgery procedures as a private surgical attending at St. John's Episcopal Hospital.

(Cplt. PP 14-15).

Second, and apparently at the heart of this dispute, are Plaintiff's allegations that he was in fact granted privileges to perform the subject surgeries, in writing, when he was placed on the Department of Surgery's on-call schedules. (Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss ("Plf.'s Memo.") at 13). In particular, Plaintiff alleges that beginning on June 12, 1996 and continuing until September 1996, his name appeared on the surgical schedules for vascular and general surgical cases. (Cplt. PP 23-25). According to Plaintiff, these schedules were prepared by the Department of Surgery under the supervision of the Director of Surgery. (Cplt. P 25).

Consequently, the Court concludes that Plaintiff has sufficiently alleged his employment qualifications.

### 2. Fourth Prong—Discriminatory Motivation

Defendants additionally contend that Plaintiff fails to set forth sufficient facts from which a reasonable inference of discrimination could be drawn. The Court disagrees.

█ The Amended Complaint sets forth several allegations from which a reasonable inference of discrimination based on age, national origin and/ or race could be drawn. First, upon termination of employment at NCMC, Dr. Hamad was replaced by a younger, Caucasian male. (Cplt. P 48). Second, at the time of his termination, Dr. Hamad was the oldest full-time physician in the Emergency Room, the oldest attending physician in the Department of Surgery and approximately one year shy of having his pension vested. (Cplt. PP 35, 49). Furthermore, Dr. Hamad alleges that he was the only person of color in the Department of Surgery and, despite allegations of misconduct and malpractice, other Caucasian physicians in the department were not subjected to adverse employment actions. (Cplt. P 50).

In viewing these allegations in a light most favorable to Plaintiff and accepting them as true, the Court finds the pleadings sufficient to establish a prima facie claim under both Title VII and the ADEA. In particular, a reasonable inference of discrimination based on age, national origin and/ or race is sufficiently supported by the pleadings where Plaintiff was the oldest attending physician in the department and one year away from having his pension vested when he was terminated. In addition, Plaintiff, an individual of Filipino descent, was replaced by a younger Caucasian male and purportedly subjected to disparate treatment within the department.

However, it is incumbent upon the Court to apply applicable law as it currently exists even though the law may have changed since the filing of this action. The Court refers specifically to the Supreme Court's recent decision in *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In *Kimel* a majority of the Supreme Court held that "the ADEA [was] not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment .... [and that the] ADEA's purported abrogation of the States' sovereign immunity [was] invalid." *Id.* at 91, 120 S.Ct. at 650. In concluding that the ADEA was not "appropriate legislation" under section 5 of the Fourteenth Amendment, the Supreme Court stated that "the substantive requirements the ADEA imposes on state and *local governments* are disproportionate to any unconstitutional conduct that conceivably could be targeted by the [ADEA]." *Id.* at 82, 120 S.Ct. at 645 (emphasis added). Consequently, the Supreme Court affirmed the dismissal of an ADEA claim against the State of Florida.

In the instant action, Plaintiff alleges that defendants NCMC and Nassau County have discriminated against him in violation of the ADEA. Defendant NCMC is a New York State medical facility duly existing by reason of and pursuant to the laws of the State of New York.[1] (Cplt. P 7). Defendant Nassau County is a municipal corporation. (Cplt. P 8).

Therefore, in accordance with the Supreme Court's recent holding in Kimel, Plaintiff's ADEA claims are dismissed. However, as noted by Justice O'Connor, "state employees are protected by state age discrimination statutes, and may recover money damages from their state employers, in almost every State of the Union." 528 U.S. at 91, 120 S.Ct. at 650. As such, Plaintiff's remedy for alleged age discrimination lies within his NYSHRL claim which this Court deems to have been sufficiently pled. See *Boyce v. New York City Mission Soc'y*, 963 F.Supp. 290, 295 (S.D.N.Y.1997) (applying same standard in determining sufficiency of Title VII claims under New York State Human Rights Law).

## III DOCTRINE OF PRIMARY JURISDICTION

The Defendants next argue that even if the Court sustains Plaintiff's discrimination claims, the Court should nonetheless refrain from hearing this matter pursuant to the doctrine of primary jurisdiction.

The doctrine of primary jurisdiction is applicable "whenever the enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac.*

*R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); see also *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir.1996); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir.1994); *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122–23 (2d Cir.1992) (finding doctrine applicable to cases involving state agencies). The doctrine seeks to ensure that courts and administrative agencies vested with particular regulatory duties "do not work at cross-purposes." *Fulton Cogeneration*, 84 F.3d at 97 (citing *General Elec. Co. v. M.V. Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir.1987)). To that end, the doctrine serves two related interests: (1) "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and [ (2) ] the resolution of technical questions of facts through the agency's specialized expertise." *Id.* (citing *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976)); *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir.1988). As a threshold matter, courts must determine whether the court and relevant agency have jurisdiction over the same issue. *Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 60.

In New York, a physician seeking reinstatement of surgical privileges must file a complaint with the New York Public Health Council ("PHC") prior to commencing a court action. *Johnson*, 964 F.2d at 122. The PHC is vested with the authority to determine whether there is a legitimate medical justification for the revocation of a doctor's privileges. *Id.* Moreover, the PHC is best qualified to deter-

---

1. The Court takes judicial notice of the fact that NCMC is a state actor. See *Magee v. Nassau County Med. Ctr.*, 27 F.Supp.2d 154, 160 n. 5 (E.D.N.Y.1998) (taking judicial notice of fact that NCMC is state actor) (citing

*O'Malley v. Nassau County Med. Ctr.*, 686 F.Supp. 62 (E.D.N.Y.1988)); *Castelli v. Nassau County Med. Ctr.*, 664 N.Y.S.2d 94, 95, 244 A.D.2d 379 (2d Dep't 1997).

mine the propriety of the revocation of a physician's privileges. *Id.*

In the instant action, Plaintiff alleges that he was unlawfully terminated and denied surgical privileges as a result of unlawful discrimination. Furthermore, in addition to monetary relief, Plaintiff is seeking injunctive relief restoring his employment and privileges. As such, both the Court and PHC have jurisdiction over the related issue of whether Plaintiff's surgical privileges were legitimately revoked. The Court now turns to the relevant case law to determine the preclusive effect, if any, of this shared jurisdiction.

In Johnson, the Second Circuit addressed the issue of whether a physician-plaintiff seeking damages under antitrust law, as opposed to reinstatement of his previously revoked surgical privileges, was required to file a complaint with the PHC prior to asserting a federal claim. In concluding that the plaintiff was required to file with the PHC, the Second Circuit dismissed the antitrust claim pursuant to the doctrine of primary jurisdiction. The Second Circuit specifically found that the PHC's determination of whether defendants had a proper medical reason for terminating plaintiff's privileges would be dispositive of the antitrust claim. *Id.*

In Franzon, however, the district court concluded that a physician-plaintiff's assertion of constitutional violations was not barred by the doctrine of primary jurisdiction because resolution of factual issues by the relevant administrative agency would not be dispositive of the legal issues before the court. *Franzon v. Massena Mem'l Hosp.*, 977 F.Supp. 160, 165–66 (N.D.N.Y. 1997). In particular, the district court found that the constitutional claims were entirely unrelated to the termination of the plaintiff's medical privileges. *Id.* at 166. As noted by the district court in their decision, "fundamental to those cases that have dismissed a plaintiff's federal claims on the basis of primary jurisdiction, is the conclusion that the resolution of factual issues by the administrative agency will be dispositive of the legal issues before the court." *Id.* (citing *Johnson*, 964 F.2d at 121).

Here, the Court is presently confronted with constitutional claims which are related, in part, to the termination of Plaintiff's surgical privileges. In particular, Plaintiff claims that the revocation of his surgical privileges was the result of a discriminatory animus. However, unlike the facts in Johnson, whether or not defendants properly terminated plaintiff's privileges is not dispositive of the constitutional claims before this Court. Specifically, even if PHC finds that defendants had a legitimate reason for the termination of Plaintiff's surgical privileges, Plaintiff may still prevail in this action if he can prove that the proffered reasons were merely pretext for discrimination. See *Austin*, 149 F.3d at 153. Moreover, as noted by the district court in Franzon, "the PHC may only examine a very narrow range of issues, none of which involve the adjudication of constitutional rights." *Franzon*, 977 F.Supp. at 166 (citing New York Public Health Law § 2801–b(2)).

Therefore, since any factual issues resolved by PHC would not be dispositive of Plaintiff's constitutional claims, the doctrine of primary jurisdiction does not require the Court to refrain from hearing Plaintiff's claims.

## IV PLAINTIFF'S CONSTITUTIONAL CLAIMS

Defendants additionally contend that each of Plaintiff's constitutional claims must be dismissed for (1) failure to allege a liberty interest; (2) failure to allege a deprivation of due process; and (3) failure to allege a deprivation of equal protection. The Court will address each claim in turn.

### 1. Plaintiff's Liberty Interest

██ The Defendants maintain that Plaintiff has failed to establish a liberty interest because he has not denied the allegations forming the basis of his discharge in order to invoke his right to liberty. (Def.'s Memo. at 14 (citing *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977))).

██ As an initial matter, the Court notes that surgical privileges constitute a property interest for purposes of due process and that harm to reputation combined with the deprivation of a property interest in surgical privileges give rise to a due process liberty interest. See generally *Greenwood v. State, Office of Mental Health*, 163 F.3d 119 (2d Cir.1998) (holding that "privileges guaranteed by state law at a state hospital are a property interest protected by the Due Process Clause of the Fourteenth Amendment"). Here, Plaintiff avers that the defendants unlawfully terminated his employment, denied him operating room privileges, and disseminated information indicating that his termination/ denial of privileges was a result of performing surgeries without the requisite privileges. Plaintiff further claims that these actions failed to accurately reflect the fact that the subject surgeries were "performed under a schedule that was promulgated by and under the supervision of the Director of Surgery." (Cplt. P 34).

As a result, the Court finds that Plaintiff has sufficiently implicated a liberty interest for purposes of a due process claim. See *Greenwood*, 163 F.3d at 124. Specifically, Plaintiff asserts the deprivation of a property interest (i.e., the privileges) in connection with harm to reputation (i.e., dissemination of information by defendants which fails to accurately reflect Plaintiff's circumstances). *Id.* Moreover, the Defendants assertion that Plaintiff has failed to deny the charges underlying his termination/ denial of privileges is without merit. Central to the Plaintiff's complaint is his allegation that the subject surgeries were in fact performed with the consent and authorization of the Department of Surgery.

### 2. Deprivation of Due Process

Plaintiff further alleges that his constitutional right to due process was violated upon his termination with stigmatizing charges in the absence of a name-clearing hearing and upon denial of his privileges. (Cplt. PP 60, 62, 64). Defendants, however, contend that Plaintiff's due process claims must be dismissed because Plaintiff fails to implicate the adequacy of the pertinent administrative process or an Article 78 proceeding.

██ Specifically, Defendants argue that there is no due process violation where the state provides an adequate post-deprivation remedy such as an Article 78 proceeding. The Court agrees with Defendants to the extent Plaintiff's allegations implicate unauthorized acts by state employees. See *Hellenic American Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir.1996) (no constitutional violation when there is an adequate state postdeprivation procedure to remedy arbitrary deprivation of property or liberty). Moreover, courts have repeatedly found that there is no constitutional violation of due process where there is an adequate state postdeprivation remedy to address violations of a liberty interest based on harm to reputation. *Id.* at 881 (noting that Article 78 proceedings are adequate postdeprivation remedy in these instances for purposes of due process); see also *Federico v. Board of Ed. of Pub. Schs. of Tarrytowns*, 955 F.Supp. 194, 201–02 (S.D.N.Y.1997). However, where the alleged deprivation is predicated upon established state proce-

dures, "the availability of postdeprivation procedures will not, ipso facto, satisfy due process." *Id.*; see also *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265 (1982) (discussing inadequacy of state postdeprivation remedy where established state procedure causes loss of property).

■ Therefore, to the extent Plaintiff alleges violations of due process based on his termination with stigmatizing charges in the absence of a name-clearing hearing, those claims are dismissed. However, it is difficult to ascertain at this juncture the adequacy of the administrative process afforded Plaintiff pursuant to the NCMC By–Laws. Specifically, Plaintiff claims that he was denied a fair hearing regarding his termination and denial of privileges when Defendants failed to commence a subsequent hearing scheduled for March 1998 despite the Board of Managers' decision. (Cplt. PP 46, 64; Plf.'s Memo. at 18). Whether this denial constitutes "random unauthorized acts by state employees" or a deprivation based on "established state procedures" has not been discussed by the parties and is unclear to the Court. As such, the Court cannot determine, at this time, the sufficiency of Plaintiff's administrative hearing or whether the available state procedures would have provided an adequate remedy.

### 3. Deprivation of Equal Protection

■ The Fourteenth Amendment to the United States Constitution provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Essentially, the Equal Protection Clause mandates that "all persons similarly situated ... be treated alike." *Brown v. City of Oneonta, New York*, 195 F.3d 111, 118 (2d Cir.1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). In order to state a claim for an equal protection violation, claimants "must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir.1999). Intentional discrimination can be demonstrated in several ways, one of which includes identifying "a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Brown*, 195 F.3d at 118 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886)).

■ In the instant action, Plaintiff, a man of Filipino descent, alleges that he has been deprived of equal protection under the law because similarly situated Caucasian physicians were not subjected to adverse employment decisions. Specifically, Plaintiff claims, that "despite allegations of improper conduct and malpractice by other Caucasian physicians within the Department of Surgery, there have been no adverse employment actions taken against them." (Cplt. P 50). Consequently, the Court finds that Plaintiff has sufficiently plead his equal protection claim where he alleges disparate application of the Defendants' disciplinary policies based on Plaintiff's national origin and/ or race.

### V PLAINTIFF'S *42 U.S.C. § 1981* CLAIM

■ In order to state a claim under § 1981, a plaintiff must allege facts supporting the following elements: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in [§ 1981]." *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). Those enumerated activities include the rights "to make and enforce contracts, to

sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." *42 U.S.C. § 1981.*

■ The Court finds that Plaintiff has adequately plead the essential elements of § 1981 cause of action. In particular, Plaintiff alleges (1) that he is of Filipino descent, (2) his termination and denial of privileges were predicated upon a racially discriminatory animus where he was replaced by a Caucasian and where other Caucasian physicians in the department were not similarly disciplined for acts of misconduct; and (3) his termination and denial of benefits deprived him of due process and equal protection under the law. Thus, the Court deems that Plaintiff has sufficiently plead a § 1981 cause of actions to withstand a motion to dismiss.

## VI CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

■ It is well established in the Second Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Personal involvement exists where the defendant directly participates in the alleged deprivation. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citing *Johnson v. Glick,* 481 F.2d 1028, 1033–34 (2d Cir.1973)). Although the doctrine of respondeat superior does not apply to these types of actions requiring personal involvement, *Johnson,* 481 F.2d at 1034, the Courts have recognized liability in a supervisory capacity where the defendant (1) creates or permits the continuance of a policy that causes the alleged deprivation; (2) fails to remedy the alleged deprivation after learning of it; or (3) was grossly negligent in managing subordinates who caused the alleged depriva-

tion. *K & A Radiologic Tech. Servs., Inc. v. Commissioner of the Dept. of Health of the State of New York,* 189 F.3d 273, 278 (2d Cir.1999) (citing *Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998)).

■ Although Defendants maintain that Plaintiff has failed to state a cognizable claim against any of the individual defendants, a review of the Amended Complaint reveals otherwise. With respect to each of the following individual defendants, Plaintiff alleges:

1. Joseph R. Erazo, Executive Director and Chief Executive Officer of NCMC, informed Plaintiff, in writing, on January 9, 1997, that Plaintiff's employment at NCMC was terminated. (Cplt. P 13, 34).

2. Jerald C. Newman, President of the Board of Managers of NCMC, wrote to Plaintiff on June 24, 1996, informing Plaintiff that he was being reappointed to the staff of NCMC as an attending in the Department of Surgery. In addition, it was the Board of Managers who, on appeal, permitted Plaintiff to call witnesses at his hearing. Furthermore, Plaintiff claims that the Board of Managers confirmed Plaintiff's entitlement to reversal of the original decision to terminate his employment and deny him privileges. (Cplt. PP 9, 43, 45).

3. Ralph Ger, M.D., Acting Chair of the Surgery Department, met with Plaintiff on October 2, 1996, regarding the suspension of Plaintiff's privileges and questioned whether Plaintiff had privileges to perform the subject surgeries. Dr. Ger additionally notified Plaintiff on October 18, 1996, that Plaintiff's privileges were removed immediately. (Cplt. PP 10, 28–29).

4. Joan McInerney, M.D., Chair of the Department of Emergency Medi-

cine, notified plaintiff that he was suspended without pay on December 24, 1996. (Cplt. PP 11, 33)

5. David Westring, M.D., Acting Medical Director, notified the New York State Department of Health, Office of Professional Medical Conduct on December 24, 1996, that Plaintiff's privileges had been denied. (Cplt. PP 12, 31).

With the exception of Jerald C. Newman, President of the Board of Managers, Plaintiff has sufficiently alleged the personal involvement of each of the individual defendants regarding his termination and denial of privileges. Specifically, each of the individual defendants, other than Mr. Newman, participated in Plaintiff's suspension, denial of privileges, or termination. With respect to Jerald C. Newman, however, his actions, as alleged in the Amended Complaint, appear to have benefitted Plaintiff. In particular, the Board of Managers found in favor of Plaintiff on appeal and confirmed that Plaintiff was entitled to a reversal of the committee's determination. (Cplt. PP 44–45). Although Plaintiff maintains that Mr. Newman misled Plaintiff into believing that he had the requisite privileges by reappointing him to the staff and participated in denying Plaintiff an appropriate hearing, (see Plf.'s Memo. at 22), it would take a leap in logic for the Court to make such an inference based on a review of the pleadings. Consequently, the allegations are insufficient to implicate Mr. Newman's direct personal involvement in the violation of Plaintiff's constitutional rights. Accordingly, Plaintiff's claims against Mr. Newman are dismissed.

## VII CLAIMS AGAINST NCMC AND NASSAU COUNTY

■ Defendants contend that Plaintiff's §§ 1981 and 1983 claims against NCMC should be dismissed because NCMC is "not a person under *42 U.S.C.*

*§§ 1981* and 1983." (Def.'s Memo. at 20 (citing *O'Neal v. County of Nassau*, 992 F.Supp. 524, 531 n. 10 (E.D.N.Y.1997))). The Court disagrees to the extent such a position is inconsistent with our prior decisions. See, e.g., *Magee v. Nassau County Med. Ctr.*, 27 F.Supp.2d 154, 161 (E.D.N.Y. 1998) (noting that court has jurisdiction to hear claimant's § 1983 claim against NCMC); *O'Malley v. Nassau County Med. Ctr.*, 686 F.Supp. 62 (E.D.N.Y.1988) (maintaining § 1983 claim against NCMC). As such, Plaintiff's §§ 1981 and 1983 claims against NCMC are not dismissed.

Defendants further argue that Plaintiff's §§ 1981 and 1983 claims should be dismissed against municipal defendant Nassau County. In particular, Defendants assert that Plaintiff has failed to plead the existence of an official policy or custom adopted by Nassau County which deprived Plaintiff of his constitutional rights.

■ In order to maintain a § 1983 action against a municipal defendant "the plaintiff must identify a municipal policy or custom from which the alleged injury arose." See *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Tenenbaum v. Williams*, 193 F.3d 581, 597 (2d Cir. 1999). "This 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.'" *Tenenbaum*, 193 F.3d at 597 (quoting *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

In paragraph 46 of the Amended Complaint, plaintiff alleges:

by promulgating and applying such policies which allow Defendants to deny Plaintiff his right to a hearing, NCMC and Nassau County have engaged in a

policy and practice which violates Dr. Hamad's constitutional rights to liberty and property.

(Cplt. P 46). The above allegation refers to a specific incident whereby Plaintiff was denied his right to an administrative hearing. Moreover, this is the only instance throughout the entire Amended Complaint where Plaintiff alleges a policy or practice in connection with Nassau County and the deprivation of his rights. The Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss, however, states that the alleged custom or policy "involved a continuing practice of overlooking the misconduct of other younger Caucasian physicians." (Plf.'s Memo. at 24). To the extent Plaintiff is now seeking to once again amend the complaint, he must first request leave of this Court. See Fed.R.Civ.P. 15(a). As a consequence, the Court shall focus its inquiry on the allegations as set forth in the Amended Complaint.

■ Although Defendants correctly state that a policy or custom cannot generally be established by a single decision depriving Plaintiff of his rights, the Supreme Court has found that in some cases, a single decision by a municipal policymaker may suffice to establish a "policy" or "custom." See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). At this point in the litigation, however, it is impossible for the Court to conclusively determine the extent to which the decisions by NCMC officials constituted decisions by "municipal policymakers." Accordingly, Defendants request to dismiss the claims against defendant Nassau County is denied.

## VIII THE HEALTH CARE QUALITY IMPROVEMENT ACT

Defendants additionally argue that Plaintiff's claims are barred pursuant to the Health Care Quality Improvement Act, *42 U.S.C. § 11101,* · et seq. ("HCQIA").

Defendants contend that HCQIA "hold[s] defendants immune from suits for monetary damages for actions taken pursuant to the Act." (Def.'s Memo. at 21). However, although not specifically ruled on by the Second Circuit, other Circuit Courts have held that HCQIA does not establish immunity from suit. See, e.g., *Manion v. Evans*, 986 F.2d 1036, 1042 (6th Cir.1993) (holding that HCQIA does not confer a right not to stand trial); *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 437 (10th Cir. 1992) (finding that HCQIA does not provide immunity from suit). Thus, in accordance with the reasoning employed by other federal courts, the Court determines that Plaintiff is not barred by HCQIA from asserting his claims against the defendants.

## IX ERISA CLAIM

By its terms, ERISA excludes from its coverage "any employee benefit plan if ... such plan is a governmental plan." *29 U.S.C. § 1003* (b)(1). A "governmental plan" is defined as

a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of the foregoing.

*29 U.S.C. § 1992* (32).

It is undisputed by the parties that, as an employee of Nassau County, Plaintiff was covered by a "governmental plan" within the meaning of ERISA. (see Def.'s Memo. at 22 (citing New York Retirement and Social Security Law); see generally Plf.'s Memo.). Consequently, Plaintiff's ERISA claim is dismissed. See, e.g., *Roy v. Teachers Ins. And Annuity Assoc.*, 878 F.2d 47, 50 (2d Cir.1989) ("when a pension plan has been established by a governmental entity for its employees and the governmental entity's status as employer has

not changed, the plan must be exempt from ERISA").

## CONCLUSION

In accordance with the above discussion, Defendants' motion to dismiss the Amended Complaint is granted, in part, and denied, in part. Specifically, Plaintiff's second, fourth, fifth and tenth causes of action are dismissed.

SO ORDERED.

## *MEMORANDUM & ORDER*

Plaintiff, Dr. Delfin P. Hamad, commenced the instant action alleging unlawful discrimination in employment as well as violations of his constitutional rights to due process and equal protection in connection with the termination of his employment and denial of operating room privileges at the Nassau County Medical Center ("NCMC"). In the complaint, plaintiff asserts several claims pursuant to: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.;* (2) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.;* (3) the New York Human Rights Law, N.Y. Exec. Law §§ 292, *et seq.;* (4) the Fifth and Fourteenth Amendments of the United States Constitution; (5) Article 1, Section 6 of the New York State Constitution; (6) 42 U.S.C. §§ 1981 and 1983; and (7) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1462.

In a Memorandum and Order dated March 20, 1999 (the "Order"), the Court dismissed plaintiff's ADEA and ERISA claims, and further dismissed all claims against defendant Dr. Jerald C. Newman.

Pending before the Court is plaintiff's unopposed motion for reconsideration requesting the Court the reconsider the dismissal of plaintiff's ADEA claim against NCMC and Nassau County. Also pending before the Court is plaintiff's request for leave to file a motion to amend the complaint for the purpose of "narrowing" his claims.

## DISCUSSION

The standards controlling a motion for reconsideration are set forth in Local Civil Rule 6.3 and Fed.R.Civ.P. 59(e). Reconsideration is appropriate only where the court has "overlooked controlling decisions or factual matters put before it on the underlying motion," *In re New York Asbestos Litigation,* 847 F.Supp. 1086, 1141 (S.D.N.Y.1994), and which, had they been considered, "might reasonably have altered the result reached by the court." *Consolidated Gold Fields v. Anglo American Corp.,* 713 F.Supp. 1457, 1476 (S.D.N.Y.1989). Rule 6.3 "precludes a party from advancing new facts, issues or arguments not previously presented to the court," *Bank Leumi Trust Co. of New York v. Istim, Inc.,* 902 F.Supp. 46, 48 (S.D.N.Y.1995), and Rule 6.3 is to be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered by the court." *Anglo American Ins. Group v. CalFed Inc.,* 940 F.Supp. 554, 557 (S.D.N.Y.1996). The purpose of Rule 6.3 is to "enure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988). Additionally, a Rule 6.3 motion "is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

This Court's prior Order dismissed plaintiff's ADEA claims against NCMC and Nassau County pursuant to the Supreme Court's recent decision in *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120

S.Ct. 631, 145 L.Ed.2d 522 (2000). In *Kimel,* a majority of the Supreme Court held that Congress' attempt to abrogate the states' sovereign immunity under the Eleventh Amendment in the ADEA was an invalid exercise of legislative authority under Section 5 of the Fourteenth Amendment. *Id.* at ——, 120 S.Ct. at 650. In their decision, the Supreme Court determined that "the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the [ADEA]." *Id.* at 82, 120 S.Ct. at 645. As a result, the Supreme court dismissed plaintiff's ADEA claims against the State of Florida.

 Applying recent Supreme Court precedent, this Court similarly dismissed plaintiff's claims against municipal defendants NCMC and Nassau County. However, in his motion for reconsideration plaintiff argues, and this Court agrees, that the scope of *Kimel's* holding is not so broad as to require the dismissal of plaintiff's claim against NCMC. Specifically, it is well established that Eleventh Amendment immunity applies only to the states, and not to counties and similar municipal corporations. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations.") (internal and external citations omitted); *see also Mancuso v. New York State Thruway Auth.,* 86 F.3d 289, 294 (2d Cir.1996); *Holley v. Lavine,* 605 F.2d 638, 642–43 (2d Cir.1979); *Community Health Care Ass'n of New York v. DeParle,* 69 F.Supp.2d 463, 473 (E.D.N.Y.1999). At present, it is undisputed that NCMC is a department of Nassau County, a municipal corporation. As such, the principal concern of *Kimel,* namely, Eleventh Amendment immunity,

is not implicated by a cause of action arising under the ADEA and asserted against defendant NCMC. Therefore, to the extent the ADEA remains a valid exercise of congressional authority under the Commerce Clause, *see EEOC v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (holding that the ADEA constitutes a valid exercise of the Commerce Clause power), the ADEA must be enforced against private and public actors subject to the Eleventh Amendment's bar to suits by private individuals against the state in federal court where the state has not waived sovereign immunity. Accordingly, plaintiff's motion for reconsideration regarding his ADEA claim against defendant NCMC is granted.

 However, with respect to defendant Nassau County, the Court denies plaintiff's motion for reconsideration on other grounds. A prerequisite to pursuing an ADEA and/or Title VII claim against a defendant is the filing with the EEOC or pertinent state agency a complaint naming the defendant. *See Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir.1991); *see also* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e–5. A district court generally lacks subject matter jurisdiction over individuals not named in the EEOC charge. *See Harrington v. Hudson Sheraton Corp.,* 2 F.Supp.2d 475, 477 (S.D.N.Y.1998) (citation omitted). Nevertheless, bearing in mind the remedial goals of Title VII, the Second Circuit counsels a "flexible stance in interpreting Title VII's procedural provisions …", *Johnson,* 931 F.2d at 209 (quoting *Egelston v. State Univ. College at Geneseo,* 535 F.2d 752, 754–55 (2d Cir.1976)), because parties who file EEOC charges may not be "versed in the vagaries of Title VII and its jurisdictional and pleading requirements." *Id.* Accordingly, several courts have acknowledged an exception to the general rule that a defendant be named in the

EEOC charge where there is an "identity of interest" between the unnamed defendant and the party named in the administrative charge. *Id.* (citations omitted). Yet, several courts in this Circuit have declined to invoke the "identity of interest" exception where the plaintiff's administrative pleadings have been prepared with the assistance of counsel. *See Harrington,* 2 F.Supp.2d at 478 (identity of interest exception does not apply where a plaintiff was represented by counsel when she filed her EEOC charge); *Kudatzky v. The Galbreath Co.,* 1997 WL 598586, at *2–3 (S.D.N.Y. Sep. 23, 1997) (same); *Tarr v. Credit Suisse Asset Mgmt., Inc.,* 958 F.Supp. 785, 794 (E.D.N.Y.1997) (same); *but see Manzi v. DiCarlo,* 62 F.Supp.2d 780, 787–88 (E.D.N.Y.1999) (representation by counsel is a nondispositive consideration in determining whether an identity of interest exists). Indeed, the underlying concern guiding this Circuit's adoption of the "identity of interest" exception is that certain individuals lack the legal wherewithal to identify adequately the parties responsible for the violation of their federal rights. *See Johnson,* 931 F.2d at 209. Such concern, however, is inappropriate where an individual's EEOC charge and related documents have been prepared by counsel familiar with ADEA and Title VII requirements.

It is undisputed that Nassau County is not a named defendant in plaintiff's EEOC charge. *See* Def. Memo. in Support of Motion to Dismiss at 18 fn.2. Nor is it disputed that plaintiff's administrative charge was prepared with the assistance of counsel well versed in the vagaries of both Title VII and the ADEA. *See id.* In accordance with the majority of district court's addressing the issue in the Circuit, this Court similarly holds that the "identity of interest" exception is not available to plaintiff since he was represented by counsel at the time he filed his EEOC charge. *See Harrington,* 2 F.Supp.2d at 478; *Ku-*

*datzky,* 1997 WL 598586, at *2–3; *Tarr,* 958 F.Supp. at 794. Consequently, plaintiff is not excused from failing to name Nassau County as a defendant in the EEOC charge and his motion for reconsideration regarding the claims against Nassau County is denied.

### CONCLUSION

Accordingly, for the aforementioned reasons, plaintiff's motion for reconsideration is GRANTED, in part, and DENIED, in part.

▇▇▇ In addition, having reviewed the proposed Amended Complaint attached to plaintiff's letter request, the Court finds it unnecessary for plaintiff to file a formal motion in support of the request for leave to file an amended complaint. It is well-established that leave to amend should be granted freely, and amendment is typically permitted in the absence of any apparent undue delay, bad faith, undue prejudice or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Nerney v. Valente & Sons Repair Shop,* 66 F.3d 25, 28 (2d Cir.1995). A review of the proposed Amended Complaint reveals that plaintiff is merely narrowing the scope of his claims in light of this Court's prior Order. Accordingly, plaintiff is hereby granted thirty days from the date of this order to file and serve the Amended Complaint.

Finally, the Court is well aware of defendants' continued objection to plaintiff's pursuit of this action based on the Consent Agreement and Surrender of Surgical Privileges and Order (the "Consent Agreement") entered into by plaintiff with the Office of Professional Medical Conduct of the State Health Department dated August 4, 1999. The Court is also aware that, as a result of the Consent Agreement, plaintiff surrendered his surgical license and was placed on five years proba-

tion with respect to his medical license. As such, upon the completion of discovery, and in anticipation of the expected motion for summary judgment, the parties are hereby directed to refer to my Individual Rules regarding the procedures for filing a motion for summary judgment.

SO ORDERED.