**Barbara E. SALAMON, M.D., Plaintiff,**

v.

**OUR LADY OF VICTORY HOSPITAL, Michael C. Moore, M.D., Franklin Zeplowitz, M.D., John F. Reilly, M.D., Albert J. Diaz–Ordaz, M.D., and John P. Davanzo, Defendants.**

No. 99–CV–048S.

United States District Court, W.D. New York.

April 3, 2012.

Order Denying Reconsideration June 26, 2012.

Richard H. Wyssling, Richard H. Wyssling, Esq., Buffalo, NY, Plaintiff.

Randall David White, Terrence M. Connors, Connors & Vilardo, LLP, Buffalo, NY, Richard A. Clack, Amigone, Sanchez, Mattrey & Marshall, LLP, Edward C. Cosgrove, J. Michael Lennon, The Cosgrove Law Firm, Buffalo, NY, Anthony J. Latona, Jaeckle Fleischmann & Mugel, LLP, Williamsville, NY, for Defendants.

## DECISION AND ORDER

WILLIAM M. SKRETNY, Chief Judge.

### I. INTRODUCTION

Plaintiff Barbara E. Salamon, M.D., commenced this action on January 21, 1999 against Defendants Our Lady of Victory Hospital ("OLV" or "the Hospital") and five medical personnel associated therewith—Dr. Michael C. Moore, Dr. Franklin Zeplowitz, Dr. John F. Reilly, Dr. Albert J. Diaz–Ordaz, and John P. Davanzo (collectively referred to herein as "Defendants"). In her Amended Complaint (Docket No. 5), Plaintiff alleged, *inter alia,* that defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"),[1] by subjecting her to sexual harassment, discrimination, and by conspiring to negatively impact her future employment opportunities. She further alleged violations of New York

---

1. NYSHRL claims are analytically identical to claims brought under Title VII. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714–15 (2d Cir.1996) (citations omitted).

State common law by tortiously interfering with her business relations.

In a previous Decision and Order this Court (Elfvin, J.) granted summary judgment in favor of the Defendants, dismissing Plaintiff's Title VII and NYHRL claims on the ground that she was not an employee of OLV, rejecting her Title VII claim under *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), and declining to exercise supplemental jurisdiction over the remaining state tortious interference claims. (Docket No. 127.) The Court of Appeals for the Second Circuit vacated this Court's decision as to Plaintiff's Title VII and NYHRL claims, holding that genuine issues of material fact existed as to the degree of control OLV exercised over Plaintiff for purposes of determining whether she was an "employee" under Title VII. (Docket No. 163.)

Defendants' Motions for Summary Judgment (Docket Nos. 101, 104, 106, 107) are again before this Court.[2] For the following reasons, this Court finds that Defendants are not entitled to summary judgment.

## II. BACKGROUND

### A. Procedural History

Plaintiff, a female gastroenterologist, was a member of the medical staff at OLV with privileges in gastroenterology. She commenced this action against OLV and the other defendants on January 21, 1999, and filed an Amended Complaint on March 5, 1999. (Docket Nos. 1, 5.)[3] The Amended Complaint asserted eight causes of action, the first five of which were brought under anti-trust law, and were dismissed by this Court (Elfvin, J.) pursuant to Fed. R.Civ.P. 12(b)(6) by Order dated October 5, 1999. (Docket No. 20.) The sixth and seventh causes of action alleged sexual harassment, and a discriminatory OLV "peer review" process that resulted in a "reeducation" and mentoring requirement in violation of Title VII and NYSHRL. The eighth cause of action asserted state law claims for tortious interference with contract and prospective business relations.

Defendants moved for summary judgment on February 12, 2001. (Docket Nos. 38, 39, 41, 43.) This Court then granted Plaintiff's motions under former Fed. R.Civ.P. 56(f), allowing Plaintiff additional time to conduct discovery to oppose the Defendants' motion. Plaintiff's opposition papers were filed on May 21, 2004, and Defendants submitted their reply on July 21, 2004. The motion was orally argued and submitted on July 30, 2004.

On March 8, 2006, this Court (Elfvin, J.) issued a decision granting summary judgment in the Defendants favor on Plaintiff's Title VII and NYSHRL claims for lack of the required employee-employer relationship, and declining to exercise supplemental jurisdiction over her remaining state law claims.

In an amended decision, a panel of the Second Circuit vacated the entry of summary judgment and remanded the case for further consideration of the Defendants' motion. (Docket No. 162.) Specifically, the Second Circuit found that "viewing the circumstances of this particular case in the

---

**2.** In the interest of judicial economy, Defendants Reilly, Diaz–Ordaz, and Moore have adopted the affidavits and memorandum of law submitted by Defendants OLV, Zeplowitz, and Davanzo, in support of their summary judgment motions. While Defendants' four motions have been docketed individually, this Court will treat their submissions as a collective motion for summary judgment.

**3.** Plaintiff first filed a complaint with the U.S. Equal employment Opportunity Commission ("EEOC") on December 29, 1998. The EEOC dismissed the complaint, finding that she was not an employee of OLV.

light most favorable to the plaintiff, the nonmoving party, [Plaintiff] has demonstrated a genuine factual conflict regarding the degree of control OLV exercised over her," and instructed that, on remand, the district court was to reweigh all of the thirteen factors set forth in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) to determine whether Plaintiff was an employee of the Hospital for purposes of Title VII. *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 231 (2d Cir. 2008).

Defendants have now renewed their motion for summary judgment. Save for a handful of supplemental filings, the parties rely in large part on their previously-filed papers.

## B. Factual Background

### 1. The Parties

Plaintiff is a physician licensed to practice in the State of New York, board certified in Internal Medicine and Gastroenterology ("GI"). In 1995,[4] Plaintiff applied for and was granted temporary staff privileges at OLV. At the time, Plaintiff was the only female physician in the GI Division. Following a full asset merger of OLV and Mercy Hospital (with Mercy Hospital to be the surviving corporation), Plaintiff's medical staff membership and privileges at OLV automatically expired as of June 16, 2003, when OLV's Operating Certificate expired. Thus, Plaintiff remained on staff continuously at OLV for a period of nearly nine years. During that time, she was subject to OLV's Staff Rules and Regulations and the requirements of various certifying agencies as well as applicable state and federal laws. (Def. Stmt. of Facts, (Docket No. 103) ¶¶ 1–6.)

During the times relevant to this action, Michael Moore, M.D. ("Moore") was the Chief of OLV's Gastroenterology Division, and a member of the OLV Board of Directors, the Professional Affairs/Credentialing Committee, the Quality Assurance/Utilization Management Committee, the Human Resources Committee of the Board, and later became president of Medical Staff at Mercy Hospital. Franklin Zeplowitz, M.D. ("Zeplowitz") was OLV's Chief of Staff, Vice President of Medical Affairs, Chairman of the Medical Executive Committee and the Chief of OLV's Credentials, Quality Assurance and By–Laws Committees. John Reilly ("Reilly") was OLV's Chief of Medicine and a member of OLV's Medical Executive Committee. Albert Diaz–Ordaz ("Diaz–Ordaz") was a member of OLV's Quality Assurance Committee, and John Davanzo ("Davanzo") was OLV's President/Chief Executive Officer. (Pl. Aff., (Docket No. 149) ¶¶ 8–10.)

### 2. Plaintiff's Relationship with OLV

Plaintiff received the privileges and was subject to the duties of all staff physicians at OLV. (Def. Stmt. of Facts, ¶ 10.) Her clinical privileges extended to the use of the hospital's facilities, including access to the endoscopy equipment in the GI lab, which was vital to her practice. Plaintiff contends that she was wholly dependent on OLV's instrumentalities to work. Plaintiff was required to use OLV's nursing and support staff in her treatment of patients at the Hospital. (Pl. Aff., ¶¶ 4, 6, 155, 175.)

Plaintiff was generally free to set her own hours and maintain her own patient load, subject to the availability of the endoscopy equipment, which the Hospital

---

**4.** Plaintiff asserts that she was granted associate staff privileges in 1994. (Pl. Aff., ¶ 6.) This Court does not consider this to be mate-rial as Plaintiff remained on staff at OLV for a period of nearly nine years.

controlled, and to an on-call requirement discussed below. (Def. Stmt. of Facts, ¶¶ 16–17; Pl. Aff. ¶¶ 36, 148.) She determined which patients to see and treat, and whether or not to admit them to OLV (or another hospital). Plaintiff was allowed to maintain staff privileges at other hospitals, and she did so, although the majority of her practice was at OLV. (Def. Stmt. of Facts, ¶¶ 17–18; Pl. Aff. ¶¶ 558–59.) OLV did not pay her a salary, wages, benefits, or any other monetary compensation. She billed patients (or their insurers) directly for her services, while OLV billed them separately for the corresponding use of its facilities. Plaintiff carried her own professional liability insurance. (Def. Stmt. of Facts, ¶¶ 12, 19–22.)

Plaintiff, like all physicians at OLV, was subject to the Hospital's policies, supervision and management, including Staff Rules and Regulations and Hospital by-laws. (Def. Stmt. of Facts, ¶¶ 10–11.) Plaintiff was also obliged to participate in regular staff meetings and spend a certain amount of time "on call" for OLV. During this required on-call time, Plaintiff was required to treat OLV patient needs as they arose, whether or not they were her patients. This duty extended to "follow up" treatment, obligating her to continue treating a patient she had first seen while on call, even after her on-call time was over. (Pl. Aff., ¶¶ 74–77.)

The most significant mechanism of supervision over Plaintiff, and the focal point of the Second Circuit's decision, was OLV's Quality Assurance ("QA") Program, in which Plaintiff was required to participate as a condition of her privileges. Under the QA Program, different hospital practitioners, on a rotating basis, would review procedures that had been conducted during the quarter. Cases flagged as potentially problematic would be discussed at mandatory GI Division meetings. OLV

also had a peer review process for further examining the practice of doctors whose cases had been flagged through the QA Program. (Def. Stmt. of Facts, ¶¶ 26–27; Pl. Aff., ¶¶ 38–53.)

Finally, OLV also reported to the National Practitioner's Data Bank ("NPDB"), a database that contains adverse information about doctors that would be queried when a doctor sought privileges at a hospital. According to Plaintiff, the QA Program included detailed requirements as to when and how her work was to be performed, requirements intended in some cases to maximize profits, not patient care. (Pl. Aff., ¶¶ 61, 64–65.)

### 3. Claims of Harassment

From the beginning of her time at OLV in September, 1994, Plaintiff alleges that Defendant Moore made a number of inappropriate and unwelcome comments to her. Over time, those comments escalated in frequency and in nature, and became increasingly sexual, despite Plaintiff's complaints about Moore's behavior. Plaintiff also felt that she was subject to a hostile work environment based on Moore's ongoing sexual relationship with a female nurse in the GI Division. Around this time, Moore began selecting Plaintiff's cases for peer review at the GI Division's quarterly meetings. While Plaintiff's cases were selected for review, inappropriate and inadequate treatment provided by the male physicians (including Moore himself) in the GI Division was overlooked. (Pl. Aff., ¶¶ 80–88, 176–228, 229–276.)

After repeatedly rejecting Moore's advances, Plaintiff met with Albert Condino ("Condino"), OLV's former CEO,[5] and Defendant Zeplowitz, in August, 1999, to advise them of Moore's sexual harassment and the unfair treatment she was receiving

---

**5.** Defendant Davanzo succeeded Condino in this position.

during the QA meetings. Although Condino and Zeplowitz assured Plaintiff that her claims would be investigated, the Defendants did not conduct any investigation of Plaintiff's allegations of sexual harassment against Moore. Moore denied Plaintiff's allegations, and Condino and Zeplowitz concluded that Plaintiff's complaints were unfounded. (Pl. Aff., ¶¶ 229–246, 252.)

### 4. Claims of Discrimination and Retaliation

At a subsequent meeting with Condino and Zeplowitz, Plaintiff was informed that OLV's Department of Medicine would conduct a general review of procedures across the GI Division. Instead, Condino and Zeplowitz initiated a review of Plaintiff's patient procedures dating back one and-a-half years, including cases that had previously been peer reviewed and were not identified as being problematic. Condino and Zeplowitz assigned Defendant Moore and two other doctors to review the procedure reports for Plaintiff's cases. Plaintiff alleges that the reviewing physicians provided incorrect, misleading, and/or false information in the internal reviews. Further, no other physician was subject to the same peer review process, and Plaintiff's practice was not compared to that of the male gastroenterologists at OLV. (Pl. Aff., ¶¶ 251–276.)

Plaintiff's work was then subjected to several additional levels of review, which yielded conflicting results. For example, one physician, who was not a specialist in the peer review process, provided an unfavorable report, while a second external review of the same cases indicated that Plaintiff's practice met community and national standards of care. Plaintiff was also subject to the following: a three-physician internal review; a review by a five-physician ad hoc committee, including an interview with Plaintiff and submission of written arguments by her; ratification of the ad hoc committee's review by an eleven-physician Medical Executive Committee ("MEC") following an appearance and written submissions by Plaintiff; a hearing before a five-physician hearing panel, including testimony and cross-examination by Plaintiff, on Plaintiff's appeal from the MEC's determination; and, at Plaintiff's request, further review by the OLV Board of Directors. (Pl. Aff.¶¶ 277–352.)

Following Plaintiff's unsuccessful challenges to the peer review process, the Defendants decided to impose a "reeducation" plan on Plaintiff, also over Plaintiff's objection. Ultimately, however, no physician mentor could be found to accept the responsibility to carry out the proposed program, and the reeducation requirement ultimately became moot as OLV merged into Mercy Hospital in 2003, ending Plaintiff's medical staff privileges at OLV. (Pl. Aff., ¶¶ 353–389.)

During this time period, Plaintiff's procedures and consultations at OLV diminished in numbers, as did her referrals from other physicians. Although no report was ever made to the NPDB, Plaintiff's reputation of poor work quality had spread throughout the area and caused severe injury to Plaintiff's practice. (Pl. Aff., ¶¶ 559–561, 566, 578–579.)

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a rea-

sonable jury could return a verdict for the non-moving party." *Id.* In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

**B. Title VII**

Title VII states that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1). It is well-settled that "Title VII and NYHRL Title VII and the NYHRL cover 'employees,' not independent contractors." *Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 113 (2d Cir.2000).

As the Second Circuit noted in *Salamon,* a reviewing court must look to the common law of agency in addressing whether a plaintiff is an employee or an independent contractor. *Salamon,* 514 F.3d at 226–27 (citing cases) (applying common-law agency test to Title VII claims); *Fowler v. Scores Holding Co., Inc.,* 677 F.Supp.2d 673, 679 (same for NYSHRL claims). The common-law agency test "depends on a fact specific analysis of thirteen factors articulated by the Supreme Court in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)." *Salamon,* 514 F.3d at 226. The "*Reid* factors" are as follows:

> [1] the hiring party's right to control the manner and means by which the product is accomplished[,] .... [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

*Id.* (quoting *Reid,* 490 U.S. at 751–52, 109 S.Ct. 2166).

In applying the *Reid* factors, "a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant[,] or (2) of 'indeterminate' weight." *Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 114 (2d Cir.2000). Although no single *Reid* factor is dispositive, the Second Circuit has found that in the context of anti-discrimination cases, the " 'greatest emphasis' should be placed on the first factor—that is, on the extent to which the hiring party controls

the 'manner and means' by which the worker completes his or her assigned tasks." *Eisenberg*, 237 F.3d at 114 (quoting *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993)); *Salamon*, 514 F.3d at 227–28 ("What is at issue · is not merely the right to dictate the outcome of the work, but the right to control the 'manner and means' by which the hiree accomplishes that outcome."). "The issue of whether a hired worker is an independent contractor or an employee is 'typically a question for the factfinder, unless the evidence in the record relevant to this question is undisputed, in which case a court may resolve the issue as a matter of law.'" *Nazinitsky v. Fairmont Ins. Brokers, Ltd.*, 06–CV–5555, 2010 WL 836766, at *8 (E.D.N.Y. Mar. 8, 2010) (quoting *Murphy v. Guilford Mills, Inc.*, 02–CV–10105, 2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005)).

### C. Application of the *Reid* Factors

Defendants, in their motion for summary judgment, argue that, upon reweighing all of the *Reid* factors, Plaintiff is an independent contractor for purposes of Title VII protection. (Def. Supp. Mem. (Docket No. 139) at 6.)

 The record indicates that there are disputes of fact between the parties on at least three of the *Reid* factors. In particular, the Plaintiff claims that the Defendants exerted sufficient control over Plaintiff's manner and means of work; the level of skill required to perform her job does not preclude employee status; she was wholly dependent on OLV's instrumentalities and tools when she a member of the medical staff; that her work was essential to OLV's business, and that the economic

factors, i.e., tax treatment, benefits, and salary, tip in favor of finding that Plaintiff was an employee of OLV. (Pl. Mem. 5/21/04 (Docket No. 108) at 10–19.)[6] This Court will therefore analyze the facts presented by Defendants to support their argument that Plaintiff was an independent contractor, and contrast those facts with the ones advanced by Plaintiff to show the contrary.

#### 1. Control Over Plaintiff's Work
##### a. The Peer Review Process

The Defendants claim that Plaintiff exercised discretionary control over the manner and means by which she provided medical services. (Def. Supp. Mem. 15–29.) The Second Circuit, however, found an issue of fact as to control based on Plaintiff's claim that the peer review and QA process went beyond simply monitoring patient outcomes, and directed specific medical care and treatment by her. *Salamon*, 514 F.3d at 229.

The Second Circuit acknowledged that at least four other Circuits have explicitly rejected physicians' reliance on similar arguments, finding that hospital peer review programs do not constitute exercises of control over the manner and means of physicians practice as they involve policies that simply reflect professional and governmental regulatory standards. *Id.* at 231 (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir.2004); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 262 (4th Cir.1997); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir.1996); *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir.1988)).

---

**6.** Plaintiff does not argue in her most recent submission that the *Reid* factors weigh in favor of employee status. Rather, she urges this Court to find that the employee/independent contractor finding should be made by a jury. (Pl. Mem. 8/28/09 at 12.) Accordingly, this Court has reviewed Plaintiff's *Reid* arguments contained in her Memorandum in Opposition to Defendants' Motion for Summary Judgment filed on May 21, 2004. (Docket No. 108.)

The Second Circuit distinguished those cases on the ground that OLV's peer review and QA programs went beyond merely reflecting professional governmental regulatory standards, but rather dictated "detailed treatment requirements." *Id.* at 230.

Specifically, Plaintiff asserts that OLV did not simply review the quality of her patient treatment outcomes, but mandated performance of certain procedures, the timing of others, directing which medications she should prescribe, and recommending changes to her practice based on their financial impact to the department. For example, Plaintiff states that she was "repeatedly instructed to discharge [her] patients before their treatment could be completed and to perform endoscopic procedures on an outpatient basis to economically benefit the Hospital." (Pl. Aff., ¶¶ 72–13.) Further, she attests that she was required to attend GI Division meetings "where [she] was instructed on how to perform services consistent with OLV's particular manner," and that she was required to follow a GI Division policy mandating the performance of unindicated or "prophylactic" procedures. (Pl. Aff., ¶¶ 74, 78–80.)

The Hospital's review of Plaintiff's practice resulted in a detailed reeducation and mentoring program requiring Plaintiff to be re-trained to perform services at OLV in a particular manner. (Pl. Aff., ¶ 405.) That reeducation requirement controlled specific details of her work at the Hospital, which included: "(a) indications and treatment for EGDs [esophagogastroduodenoscopies]; (b) appropriate treatment of AV [arteriovenous] malformations and removal of polyps found on colonoscopy; (c) use of pH monitoring with esophageal manometry[;] and (d) length of colonoscopy procedures and level of sedation during colonoscopy." (Pl. Aff., ¶¶ 346–347, 406.) Citing to terms from that reeducation require-ment, the Second Circuit concluded that, "'Appropriate treatment,' 'removal,' 'monitoring,' 'length of . . . procedures,' and 'level of sedation' are exactly the kinds of 'manner and means' of practice over which employers exert control. That this reeducation ultimately did not occur is beside the point." *Salamon*, 514 F.3d at 230.

Thus, Defendants urge this Court to find that, upon closer examination, the statutes and regulations require all hospitals, including OLV, to exert some control over the manner and means by which physicians render medical care and treatment by requiring them to establish and maintain standards of care. (Def. Supp. Mem. at 17–20.) Therefore, they argue, to the extent that the Hospital's QA and peer review process became involved in Plaintiff's practice, such involvement was a function of the mandatory regulatory process, and not evidence that OLV employed Plaintiff because it controlled her practice. The Second Circuit, however, has already rejected this assertion, finding that even the regulations that "come closest to governing aspects of everyday medical practice . . . do not approach the level of performance detail dictated by OLV." *See Salamon*, 514 F.3d at 231 n. 13 (citing 10 N.Y.C.R.R. § 405.16(c)(2)). Accordingly, this Court disagrees with Defendants' position that the reeducation and mentoring requirement's discussion of appropriate treatment, removal, monitoring, length of procedures, and level of sedation is the necessary consequence of the statutory and regulatory requirements that OLV's QA process ensures that physicians meet the applicable standard of care.

### b. Freedom of Choice and Non–Exclusivity

It is undisputed that Plaintiff had privileges, and treated patients at Buffalo General Hospital, Mercy Hospital, and had privileges at St. Joseph's Hospital. Defen-

dant asserts that because Plaintiff's arrangement was non-exclusive and that she had the freedom of choice to take any or all of her patients to another competing hospital, this factor outweighs the fact the there is an issue of fact as to whether OLV controlled the manner and means of Plaintiff's practice. (Def. Supp. Mem. 25–29.)

Although the relevant case law supports the Defendants' position, *see Shah*, 355 F.3d at 500 (independent contractor not required to accept patients referred to him by hospital); *Alexander*, 101 F.3d at 493 (plaintiff not required to admit patients to the defendant-hospital), Plaintiff disputes the nature of her relationship with OLV as being non-exclusive.

First, Plaintiff contends that she had "almost no" patient contacts at Buffalo. General Hospital, "very limited" patient contacts at Mercy Hospital, and never practiced out of St. Joseph's Hospital. (Pl. Aff., ¶¶ 7–8 n. 3.) Second, many of Plaintiff's new patients were referred to her directly from OLV and she was not permitted to refuse these patients. Third, Plaintiff was required by the Hospital to treat un-referred patients who had been admitted by OLV. (Pl. Aff., ¶ 35.) Finally, Plaintiff was required by OLV to treat many of her patients at OLV using its facilities, equipment, and staff, rather than at other hospitals at which she had privileges. (Pl. Ex. 6 at 29–31.) Based on these assertions, Plaintiff has raised a material issue of fact with regard to whether OLV controlled the assignment of patients and exclusivity, warranting submission of the issue to the jury.

In sum, because there are genuine issues of material fact regarding whether OLV controlled the manner and means of Plaintiff's medical practice, as a matter of law, summary judgment is precluded.

## 2. Skill Required

Plaintiff's responsibilities included performing surgical procedures and treating GI patients at OLV. Defendants argue that the education, training, and skill required to obtain a medical license for and engage in the practice of medicine indicate independent contractor status. (Def. Supp. Mem. at 33.)

Plaintiff cites to *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir.1992), in claiming her skill level supports a finding of employee because the *Aymes* court lists only "architects, photographers, graphic artists, drafters and ... computer programmers [as] highly-skilled independent contractors." *Aymes*, 980 F.2d at 862. Plaintiff claims that physicians are not on the list and thus not independent contractors.

While there is no Second Circuit precedent that states that the nature of a physician's occupation *ipso facto* imposes independent contractor status, there is no indication that the *Aymes* list was meant to be complete and, further, the Second Circuit has found as independent contractors positions not listed in *Aymes*. See, e.g., *Lee v. Glessing*, 51 Fed.Appx. 31, 33 (2d Cir.2002) (finding that physical therapist had high degree of skill as evidenced by his education, licensure, extensive work history, and ability to perform work without supervision and discretion as to how to treat patients). Indeed, several district and circuit courts, in applying the *Reid* factors, have held that the level of skill required for physicians generally tips in favor of independent contractor status. *See Alexander*, 101 F.3d 487 (finding that physician was independent contractor of hospital where he received no paid salary or benefits from hospital, had authority to exercise medical judgment over his practice, was free to associate with other hospitals, and possessed "significant specialized skills"); *Diggs*,

847 F.2d at 274 (stating that "[a] physician's work involves considerable skill."); *Chadha v. Hardin Memorial Hospital,* 202 F.3d 267 (6th Cir.2000) (rejecting discrimination claim where, among other things, plaintiff was "a trained physician with specialized skill in anesthesia and he exercised independent judgment in patient care.") (unpublished opinion); *accord, Pamintuan v. Nanticoke Memorial Hosp., Inc.,* No. 96–223–SLR, 1997 WL 129338, at *10 (D.Del.1997) (gynecologist/obstetrician "brought specialized medical skills to the workplace and operated quite independently."); *Vakharia v. Little Co. of Mary Hosp. & Health Care Centers,* 2 F.Supp.2d 1028 (N.D.Ill.1998) (anesthesiologist possessed specialized skills).

Accordingly, this Court finds that this factor weighs in favor of independent contractor status for Plaintiff.

### 3. Duration of Relationship between Plaintiff and OLV

Plaintiff had privileges at OLV for nearly ten years, and her tenure with OLV ended when her privileges automatically expired, like those of all medical staff at the Hospital. Thus, Plaintiff concedes that the duration of the parties' relationship is "not significant here and should be disregarded." (Pl. Mem. at 7–8.)

Because this Court has already determined that summary judgment is inappropriate in this case, it need not consider the length of time Plaintiff worked with OLV as a determinate factor in the *Reid* analysis.

### 4. Right to Assign Additional Projects

Plaintiff states that she was required to be "on call" for emergencies and was required to provide services to OLV's patients, and as such, supports her position that she was an employee because OLV exercised its authority to assign her additional projects. (Pl. Mem. at 17.)

Several courts have found that the "on call" requirement does not necessarily create an employer-employee relationship. *See, e.g., Alexander,* 101 F.3d at 493 (finding that the plaintiff physician's requirement to be "on call" was a product of his position and not sufficient to establish an employer-employee relationship); *Vakharia,* 2 F.Supp.2d at 1031 (while hospital's "on call" requirement may support status as an employee, standing alone it is insufficient to establish employee status); *cf. Cilecek,* 115 F.3d at 259 (finding that physician was not an employee for purposes of Title VII, pointing out that plaintiff-physician was not required to be on-call and had autonomy over his scheduling).

. Here, Plaintiff admits in her affidavit that the requirement that she be "on call" was a condition of her maintaining staff privileges as set forth in the Hospital's bylaws (Pl. Aff., ¶ 126.) This Court agrees that in this case, Plaintiff's "on call" status was a condition that Plaintiff accepted when she applied for staff privileges, and was not a duty assigned after she obtained her privileges.

This factor, accordingly, does not favor either a finding of employee or non-employee.

### 5. Plaintiff's Discretion over Hours Worked and Schedule

Defendants argue that Plaintiff had complete autonomy over the hours and times during which she conducted her medical practice. (Def. Supp. Mem. 40–42.)

Plaintiff, on the other hand, contends that she was "forced" to conduct her medical practice in accordance with a schedule established by OLV. (Pl. Aff., ¶¶ 148–54.) Specifically, Plaintiff avers that she was

only allowed to use the endoscopy rooms at certain times based on OLV's scheduling system, and that the GI unit limited scheduling on certain days. According to Plaintiff, OLV had the exclusive authority to transfer her from one schedule of hours or days to another, limit the number of hours she could work, and limit the number of procedures she could perform on a given day. Plaintiff's schedule was also dependent upon the availability of OLV nurses who monitored Plaintiff's work and "without whom [her] work could not be accomplished." (Pl. Aff., ¶ 150.) Moreover, Plaintiff has submitted evidence that physicians with staff privileges at OLV would have to apply in writing for a leave of absence, which would then be granted or denied by the Hospital. (Pl. Ex. 15 at 59.)

Accordingly, this Court believes there is a dispute as to whether Plaintiff could herself provide her own schedule or whether OLV had control over how her work schedule was set.

### 6. OLV's Tax, Benefit, and Payroll Treatment of Plaintiff

OLV did not pay Plaintiff a salary, wages, benefits, or any other monetary compensation. She billed patients or their insurers directly for her services, while OLV billed them separately for the corresponding use of its facilities. Additionally, it is undisputed that Plaintiff carried her own professional liability insurance. Thus, as this Court previously observed, these factors "heavily favor a finding of non-employee." (Mem. & Order 3/8/2006 at 21.)[7]

### 7. Plaintiff's Role in Hiring and Paying Assistants

Plaintiff started at OLV as a sole practitioner and continued as one throughout her tenure there. OLV provided her nurses and administrative staff.

The parties seem to agree that the Plaintiff's role in hiring and paying assistants is irrelevant to the analysis in this case because the nature of Plaintiff's work did not require that she hire any assistants, citing to *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111 (2d Cir.2000), a case involving a female warehouse worker whose duties included moving furniture. (Def. Supp. Mem. at 42–43; Pl. Mem. at 9.) In the physician-hospital context, however, it appears that courts have considered this factor in determining employee status where a hospital provides nursing staff or other assistance. *See, e.g., Alexander*, 101 F.3d at 493 (plaintiff was independent contractor despite the fact that he "did not supply his own equipment or assistants"); *Shah*, 355 F.3d at 500 (finding independent contractor status where hospital did not dictate plaintiff's hours or pay his assistants).

Here, OLV was exclusively responsible for the hiring, supervising, and paying the individuals who assisted Plaintiff in her work. (Pl. Aff., ¶ 142.) When Plaintiff was on-call, she used OLV's nurses and assistants, and, further, her work at OLV was dependent on the availability of those assistants. The Hospital also maintained exclusive authority over staffing patterns in the GI lab, where Plaintiff performed her work. Moreover, Plaintiff's case is

---

7. The parties did not brief the preliminary question of remuneration, which is an essential condition to Title VII claims. *O'Connor v. Davis*, 126 F.3d 112, 115–116 (2d Cir.1997). Thus, this Court assumes for purposes of this motion that the benefits Plaintiff did receive (facility, equipment, and supplies; uniforms and protective equipment; an identification card, parking at the Hospital; staff assistance; and access to OLV Human Resources files) constitutes "indirect economic remuneration" sufficient to establish that Plaintiff was hired by OLV necessary for the application of common-law agencies principles set forth in *Reid*. *Id.*

unique because the Hospital directed the GI lab nurses to supervise Plaintiff's work and report to the OLV administration any perceived deviations from standard practice and policy as part of the QA Program that Plaintiff was subject to. (Pl. Aff., ¶ 144–146.)

In this Court's view, this factor is relevant to whether OLV exercised control over Plaintiff's privileges and practice so as to warrant a finding that Plaintiff was an employee of OLV, and Plaintiff has therefore raised a triable issue of fact as to the staffing of her medical assistants.

### 8. Remaining *Reid* Factors

It is undisputed that the Hospital provided the location for Plaintiff's medical practice, provided the necessary equipment and supplies for her medical practice, and was in the regular business of providing medical services. Such is the case for most physician-hospital situations. *See Cilecek*, 115 F.3d at 262 ("that *Cilecek* used instruments of the hospital emergency room that were supplied by the hospital is also inherent in the provision of emergency medical services and likewise is not a reliable indicator of employee status."); *see also Alexander*, 101 F.3d at 493; *Diggs*, 847 F.2d at 273. Accordingly, the case law does not give significant weight to these factors, *Aymes*, 980 F.2d at 863–864, and they are therefore indeterminate as to whether Plaintiff was an independent contractor or an employer of OLV.

Nonetheless, in light of the dispute over the existence and degree of the *Reid* factors as they apply to Plaintiff's case, Plaintiff's employment status can only be resolved upon trial of the disputed material facts.

### D. Plaintiff's Remaining State Law Claims

Since the Second Circuit reversed this Court's grant of summary judgment that disposed of Plaintiff's federal claims, it also vacated the grant of summary judgment on Plaintiff's pendant state claims of tortious interference with business relationships. *Salamon*, 514 F.3d at 233.

For practical and equitable reasons, this Court will exercise supplemental jurisdiction over Plaintiff's claims of tortious interference with contract and business relations. Those claims will be brought to trial as discovery has concluded, the record is fully developed, and the claims are based on the same body of evidence as Plaintiff's federal claims.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motions are denied. The following issues remain for trial are: (1) Whether Plaintiff was an employee of OLV for purposes of Title VII; and, if so, (2) Whether Plaintiff was discriminated against and/or harassed by the Defendants in violation of Title VII and NYSHRL; and (3) Whether Defendants tortiously interfered with her contracts and prospective business relations.

### V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motions for Summary Judgment (Docket No. 101, 104, 106, 107) are denied.

FURTHER, the parties shall appear before this Court on May 11, 2012, at 9:00 a.m. for a status conference to set a trial date.

SO ORDERED.

### DECISION AND ORDER

### I. INTRODUCTION

Pending before this Court are Defendants' motions for reconsideration (Docket Nos. 169, 175, 176) of this Court's March 30, 2012 Decision and Order denying De-

fendants' motions for summary judgment (Docket No. 168). Plaintiff has filed a response to Defendants' motions, and Defendants have filed reply papers. (Docket Nos. 179–187.)

## II. BACKGROUND

Plaintiff, a female gastroenterologist, commenced this action against Defendants Our Lady of Victory Hospital ("OLV") and physicians/administrators on January 21, 1999, and filed an amended complaint on March 5, 1999. (Docket Nos. 1, 5.) The amended complaint asserted eight causes of action. The first five alleged violations of antitrust law. The sixth and seventh causes of action alleged sexual harassment and a discriminatory OLV peer review process that resulted in a "reeducation" and mentoring requirement in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"). The eighth cause of action asserted state law claims for tortious interference with contract and prospective business relations.

Plaintiff's first five claims were dismissed by the late Judge John T. Elfvin pursuant to Fed.R.Civ.P. 12(b)(6) by Order dated October 5, 1999. (Docket No. 20.)

Subsequently, on March 8, 2006, Judge Elfvin granted summary judgment to OLV on Plaintiff's Title VII and NYSHRL claims for lack of the required employee-employer relationship, and declined to exercise supplemental jurisdiction over her remaining state law claims. (Docket No. 127.)

In an amended decision, a panel of the Second Circuit vacated the entry of summary judgment and remanded the case for further consideration of Defendants' motions. (Docket No. 162.) Specifically, the Second Circuit found that "viewing the circumstances of this particular case in the light most favorable to the plaintiff, the nonmoving party, [Plaintiff] has demonstrated a genuine factual conflict regarding the degree of control OLV exercised over her," and instructed that, on remand, the district court was to reweigh all of the thirteen factors set forth in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) to determine whether Plaintiff was an employee of the OLV for purposes of Title VII. *Salamon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 231 (2d Cir.2008).

On remand, Defendants renewed their motions for summary judgment. On March 30, 2012, this Court denied summary judgment to Defendants on the ground that a question of fact existed as to whether Plaintiff was an employee of OLV, and set forth the following issues to be resolved at trial: (1) whether Plaintiff was an employee of OLV for purposes of Title VII, and, if so, (2) whether Plaintiff was discriminated against and/or harassed by Defendants in violation of Title VII and NYSHRL; and (3) whether Defendants tortiously interfered with her prospective business relations. (Docket No. 168.)

Defendants now ask the Court to reconsider its previous Decision and Order. For the reasons that follow, Defendants' motions to reconsider are denied.

## III. DISCUSSION

### A. Standard for Reconsideration

While the Federal Rules of Civil Procedure do not specifically provide for reconsideration, *see Hamilton Plaintiffs v. Williams Plaintiffs,* 147 F.3d 367, 371 n. 10 (5th Cir.1998), a party may move to amend or correct a judgment pursuant to Rule 59(e) or for relief from a judgment or order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

Rule 59(e) permits a party seeking to alter or amend a judgment to file a motion "no later than 28 days after the entry of judgment." Fed.R.Civ.P. 59(e). If the Rule 59(e) motion is not timely filed then the motion to reconsider will be treated as a Rule 60(b) motion, which specifies that a court may relieve parties from final judgments, orders, or proceedings for, *inter alia,* mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b). A motion for reconsideration under Rule 60(b) "[is] generally granted only upon the showing of exceptional circumstances." *Mendell v. Gollust,* 909 F.2d 724, 731 (2d Cir.1990), *aff'd,* 501 U.S. 115, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991); *Nemaizer v. Baker,* 793 F.2d 58, 61–62 (2d Cir.1986).

■■■ Under both Rules 59(e) and 60(b), the decision to grant or deny a motion for reconsideration is within "the 'sound discretion of a district court judge.'" *See Darcelin v. N.Y.,* No. 09–CV–5611, 2010 WL 723455, at *1 (E.D.N.Y. Feb. 26, 2010); *Chamberlin v. Principi,* No. 02 Civ. 8357, 2006 WL 647785, at *1 (S.D.N.Y. Mar. 15, 2006), *aff'd,* 247 Fed.Appx. 251 (2d Cir.2007) (quoting *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983)). "The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the court in deciding the original motion. *Id.; U.S. v. Gross,* No. 98–CR–0159, 2002 WL 32096592, at *4 (E.D.N.Y. Dec. 5, 2002). Nor is it proper to raise new arguments and issues. *Gross,* 2002 WL 32096592 at *4. Still, "reconsideration may be granted to correct a clear error, or prevent manifest injustice.'" *Chamberlin,* 2006 WL 647785 at *1 (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir. 1992)).

This Court has reviewed the parties' submissions and agrees with Plaintiff that Defendants have not established any of the recognized grounds to warrant reconsideration. To the extent that Defendants allege that this Court did not consider certain arguments for summary judgment, the Court will explain its rejection of those arguments below.

**B. The Alternative Grounds for Summary Judgment**

**1. Primary Jurisdiction**

Defendants have argued that Plaintiff's suit is barred under New York Public Health Law § 2801–b because she did not first file a claim with the New York Public Health Council ("PHC"). (Docket No. 139 at 63–70.)

New York Public Health Law § 2801–b prohibits improper practices in hospital staff appointments and extension of privileges, and provides that an aggrieved physician may file a complaint with the PHC, which then investigates the complaint and determines whether there is a legitimate medical justification for revocation of a physician's privileges. N.Y. Pub. Health L. § 2801–b(1)–(3).

Defendants rely on *Johnson v. Nyack Hosp.,* 964 F.2d 116 (2d Cir.1992), for the proposition that a federal district court must refrain from hearing a damages claim by a physician where the legitimacy of the termination of the physician's privileges is dispositive, and the claim has not first been filed before the PHC. *Johnson,*

964 F.2d at 121; *see also id.* at 122–123 ("Primary jurisdiction allows an agency to pass on factual issues that require specialized, technical knowledge. Either a federal or state agency may have the requisite competence to serve this purpose."). However, as at least one district court in this Circuit has observed, "the PHC may only examine a very narrow range of issues, none of which involve the adjudication of constitutional rights." *Franzon v. Massena Mem. Hosp.*, 977 F.Supp. 160, 166 (N.D.N.Y.1997) (citing N.Y. Pub. Health L. § 2801–b(2)).

In *Hamad v. Nassau County Medical Center*, 191 F.Supp.2d 286 (E.D.N.Y.2000), the district court held that the doctrine of primary jurisdiction did not preclude the plaintiff-physician's constitutional claims arising under Title VII and the Age Discrimination in Employment Act:

> Here, the Court is presently confronted with constitutional claims which are related, in part, to the termination of Plaintiff's surgical privileges. In particular, Plaintiff claims that the revocation of his surgical privileges was the result of a discriminatory animus. However, unlike the facts in *Johnson*, whether or not defendants properly terminated plaintiff's privileges is not dispositive of the constitutional claims before this Court. Specifically, even if PHC finds that defendants had a legitimate reason for the termination of Plaintiff's surgical privileges, Plaintiff may still prevail in this action if he can prove that the proffered reasons were merely pretext for discrimination.

*Hamad*, 191 F.Supp.2d at 298 (citation omitted).

█ This Court finds *Hamad'* s reasoning persuasive. The crux of Plaintiff's lawsuit against OLV is that she was treated in a disparate manner from similarly-situated male physicians and subject to sexual harassment under separate state (NYSHRL) and federal (Title VII) statutes. New York Public Health Law § 2801–b simply does not address these types of allegations.

Accordingly, Defendants are not entitled to summary judgment based on Plaintiff's failure to file a complaint with the PHC.

## 2. Pretext

█ Next, Defendants assert that Plaintiff's case fails because they had a legitimate, non-discriminatory reason for subjecting Plaintiff to the Quality Assurance ("QA") Program, which involved a peer review and monitoring of her practice at OLV. (Docket No. 139 at 70–79.) This Court, however, found a genuine issue of material fact as to whether those justifications (quality of patient care issues) were pretextual.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that the peer review process was discriminatory and that OLV acted in bad faith in conducting the QA Program with respect to Plaintiff. Defendant Moore, as Chief of the Gastroenterology Division, initiated the QA Program against Plaintiff shortly after she rebuffed his alleged sexual advances. Despite Plaintiff's formal complaint to the OLV's administration regarding Moore's involvement in the process, Moore continued to participate to some extent and discussed Plaintiff's case with the physicians appointed to review her practice. (Docket No. 149 ¶¶ 282–284, 292, Ex. 55 at 14–17, 20–23, Ex. 116 at 61–63, 67–68.).

Plaintiff also submits evidence that one physician's external review as part of the peer review process was, in large part, contrary to OLV's appointed external reviewer's assessment. (Docket No. 149 ¶¶ 327–332 & Exhibits.) Plaintiff also sought every opportunity to bolster her case before the appropriate committees

and took advantage of every level of appellate review available to her between 1996, when review of Plaintiff's practice was initiated, to 2003, when her staff privileges with OLV expired. Ultimately, when Plaintiff tried to comply with the reeducation requirement imposed by the OLV Medical Executive Committee in 2000, OLV failed to assign her a mentor that was not in direct competition with her practice and who was not directly or indirectly related to Defendants. (Affidavit of Susan Piver, Esq., dated 2/12/2001, ¶ 51, Ex. 40.) A reasonable jury could conclude from this evidence that Moore acted vindictively toward Plaintiff because she rejected his physical advances and because she made formal complaints with the OLV administration and with the Equal Employment Opportunity Commission.

This Court recognizes that the fact that an employee disagrees with the results of an adverse employment decision, or even has evidence that the decision was objectively incorrect, does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 761 (8th Cir.1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair.") It is this Court's view that Plaintiff has presented sufficient evidence to contradict Defendant's assertion that she was subject to the peer review process because she performed her job in a less than competent manner. *See Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir.2011) (in considering a motion for summary judgment, a district court is instructed not to "weigh evidence," but to "resolve all ambiguities and draw all inferences in favor of the non-moving par-

ty" so as to ascertain "whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the [movant's] favor that there remained no genuine issue of material fact for it to resolve.")

This Court therefore finds summary judgment for Defendants inappropriate on the basis that Plaintiff failed to establish pretext.

### 3. Immunity

Defendants contend that they are entitled to immunity under the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101, *et seq.,* New York Education Law § 6527(5), and New York Public Health Law § 2805–m. (Docket No. 139 at 83–84.)

First, Defendants have no viable claim of immunity under the Health Care Quality Improvement Act. This statute was enacted "to improve the quality of medical care by restricting the ability of physicians who have been found to be incompetent from repeating this malpractice by moving from state to state without discovery of such finding," established a national reporting system, and provides immunity from monetary damages for persons who participate in the peer reviewing of suspect physicians. *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1028 (4th Cir.1994) (citing 42 U.S.C. § 11101). This statute also expressly provides, *inter alia,* that the immunity provided therein does not apply to "damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ...." 42 U.S.C. § 11111(a)(1)(D).

■ Likewise, both New York Education Law § 6527(3), and New York Public Health Law § 2805–m provide exceptions to immunity where the persons

performing the peer review process do not act in good faith. *See* N.Y. Educ. L. § 6527(3) (immunity only applies where "(a) such individual has taken action or made recommendations within the scope of his function and without malice, and (b) in the reasonable belief after reasonable investigation that the act or recommendation was warranted, based upon the facts disclosed."); N.Y. Pub. Health L. § 2805–m ("The foregoing shall not apply to information which is untrue and communicated with malicious intent.")

Because there is an issue of fact with respect to whether Defendants had discriminatory and/or retaliatory animus in initiating the peer review proceedings against Plaintiff, they cannot benefit from the immunity provided by either state statute.

### 4. Statute of Limitations

Defendants argue that Plaintiff's claims that Defendant Moore sexually harassed her in 1994, 1995, and 1996, are time-barred under the limitations periods for Title VII and NYSHRL. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712, 714 (2d Cir.1996) (three-year statute of limitations applies to claims under the NYSHRL; Title VII actions must be commenced within 300 days of the alleged discriminatory action if a charge was previously filed with state employment agency). (Docket No. 139 at 86–90.)

Plaintiff does not dispute this assertion, nor does she seek to establish liability for Moore's conduct pre-dating January 21, 1996. Rather, Moore's alleged conduct after that date, which included offensive comments, sexual propositions, and misusing the peer review process against Plaintiff, gives rise to her claims against Moore. (Docket No. 151 at 44–45.) As Plaintiff points out, she is not precluded from using Moore's prior similar acts as background evidence to support her timely claims of sexual harassment. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 103, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Insofar as Plaintiff previously attempted to assert that the conduct occurring outside the statutory time period gives rise to a cause of action, such claims are now deemed abandoned and subject to dismissal.

Defendants are therefore not entitled to summary judgment on statute of limitations grounds.

### 5. Hostile Work Environment

Defendants aver that the offensive remarks made by Moore to Plaintiff are insufficient to establish a hostile work environment. (Docket No. 139 at 90–96.)

To survive a summary judgment motion with respect to a claim of a hostile work environment, a plaintiff must provide sufficient evidence to create a genuine question of fact as to whether "her workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of her employment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citation omitted). While there is no bright-line test as to the type of conduct that is required to give rise to a hostile work environment claim against an employer, courts should consider the following factors, which include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 22–23, 114 S.Ct. 367.

Defendants urge this Court to conclude that Moore's comments were merely offensive utterances rather than physical or humiliating conduct. However,

in considering the totality of the circumstances, a reasonable fact-finder could conclude that Moore's conduct had an effect on Plaintiff's working conditions. *See Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597 (2d Cir.2006) (citing, *inter alia, Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Scalia, J., concurring) ("[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered.")).

In her sworn affidavit, Plaintiff alleges that between 1996 and 1999, Moore made comments about her husband and son, stated that he liked her appearance, clothing, and the way she smelled, and told Plaintiff that he had sexual fantasies about her in the presence of other staff members. On one occasion, Plaintiff alleges that Moore confronted her in a hallway, and asked if she would be "available" for him on Sundays. Plaintiff's subsequent involvement in the Quality Assurance Program, which was initiated at Moore's request, resulted in the loss of patient referrals and damaged Plaintiff's professional reputation at OLV, thereby significantly altering Plaintiff's working conditions for the worse. *Cf., e.g., Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir.2001) (finding a triable issue where plaintiff proffered evidence that, over the course of two and one-half years, she was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm"); *but see Mormol v. Costco Wholesale Corp.,* 364 F.3d 54 (2d Cir.2004) (no triable issue where plaintiff did not claim that the offending incidents were physically threatening or humiliating, or that they interfered with her ability to do her job).

Based on the allegations noted above, and given the fact-specific nature of the determination, it is best left for the jury to decide whether the work environment is sufficiently hostile so as to constitute a change in the term, condition, or privilege of Plaintiff's employment. *See Schiano,* 445 F.3d at 605 (noting that the question is " 'especially well-suited for jury determination,' " and even where the facts are undisputed " 'summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion' ") (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 438 (2d Cir.1999)); *see also id.* at 608 ("Even assuming that ... reasonable jurors may ... disagree about whether these incidents would negatively alter the working conditions of a reasonable employee[,] ... the potential for such disagreement renders summary judgment inappropriate.") (internal quotation marks omitted).

Because Plaintiff has established a triable issue of fact with respect to her hostile work environment claim, Defendants are not entitled to summary judgment on this ground.

### 6. Vicarious Liability

Alternatively, Defendants argue that OLV is not vicariously liable for Moore's alleged conduct on the ground that he was not an employee of OLV but rather a physician in private practice with staff privileges at the hospital. (Docket No. 139 at 96–99.)

Assuming, *arguendo,* that Moore was not an employee of OLV when the alleged acts occurred, Defendants still are not entitled to summary judgment in their favor. The Second Circuit has left open the question of whether an employer can be liable for a nonemployee's harassing conduct. Rather, the Circuit Court held that if such liability does in fact exist, it is limited to instances in which the employer "provided no reasonable avenue of complaint or knew of the harassment but did nothing about it," *Quinn v. Green Tree*

*Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998), *abrogated in part on other grounds by, Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and at least one district court in this Circuit has applied the test suggested in *Quinn. See Lopes v. Caffe Centrale LLC,* 548 F.Supp.2d 47, 53 (S.D.N.Y.2008); *Heskin v. Insite Advertising, Inc.,* No. 03–cv–2598, 2005 WL 407646, at *20–21 (S.D.N.Y. Feb. 22, 2005) (holding that an employer can be held liable for the harassing acts of non-employees if a plaintiff "adduce[s] evidence tending to show that [the employer] either failed to provide a reasonable complaint procedure or that it knew of [the] harassment by [a non-employee] and failed to take any action").

The record in this case demonstrates that Plaintiff reported the alleged harassment and unfair treatment in the peer review meetings to Albert Condino ("Condino"), OLV's former CEO, and Dr. Franklin Zeplowitz ("Zeplowitz"), OLV's Chief of Staff, Vice President of Medical Affairs, Chairman of the Medical Executive Committee and the Chief of OLV's Credentials, Quality Assurance and By-Laws Committees. According to Plaintiff, Condino and Zeplowitz assured Plaintiff that her claims would be investigated, yet Defendants did not conduct a proper investigation of Plaintiff's allegations against Moore and dismissed Plaintiff's complaints as unfounded. (Docket No. 149 ¶¶ 229–246, 252.) To the contrary, Defendants contend that OLV did investigate Plaintiff's complaints of sexual harassment, which included interviews of more than a dozen people, and those interviews yielded no person with independent knowledge of any complaints of harassment by or about Plaintiff with respect to Moore. (Piver Aff. ¶¶ 5, 11, Ex. 1, 2, 3). Plaintiff in turn states that she was not interviewed, nor were certain witnesses interviewed who would have had knowledge of Moore's harassing conduct. Further, Plaintiff points out that the very person charged with investigating Plaintiff's claims of harassment, Susan Piver, Esq., was the same individual retained to prepare the hospital's quality review/disciplinary action against Plaintiff. Notably, Piver was not retained until April, 1997, several months after Plaintiff's complaints to OLV's administration.[1] (Docket No. 149 ¶¶ 277–299, 303–304.)

Accordingly, there is a disputed issue of fact as to whether OLV accepted or condoned Moore's alleged conduct, rendering summary judgment for Defendants unwarranted on this basis.

### 7. Individual Liability

The individual Defendants argue that they are entitled to summary judgment on all of Plaintiff's Title VII claims. (Docket No. 139 at 99.)

It is well settled in this Circuit that " 'individuals are not subject to liability under Title VII.' " *Sassaman v. Gamache,* 566 F.3d 307, 315–16 (2d Cir.2009) (quoting *Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004)). Plaintiff, in her memorandum of law dated August 28, 2009, acknowledges that Title VII imposes no liability against individual defendants, and thus abandoned any such claim she sought to assert in her amended com-

---

1. This Court notes and corrects a typographical error in the Decision and Order dated March 30, 2012. On pages 350–51, the Decision states, "Plaintiff met with Albert Condino ("Condino"), OLV's former CEO,[] and Defendant Zeplowitz, in August, 1999, to advise them of Moore's sexual harassment and the unfair treatment she was receiving during the QA meetings." (Docket No. 168 at 350–51.) The date should read *1996,* which was three years prior to the commencement of this lawsuit in 1999. This typographical error did not, and does not, change this Court's analysis or decision.

plaint. (Docket No. 151 at 45–46.) Plaintiff does, however, maintain that the individual Defendants may be sued under NYSHRL, which provides that "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. L. § 296(6); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Additionally, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y.1999).

■ Due to the presence of genuine issues of fact precluding summary judgment in favor of Defendants on Plaintiff's discrimination and harassment claims, a reasonable jury could also find in Plaintiff's favor on her discrimination claims against individual defendants based on the NYSHRL under the aider/abettor theory.

### 8. Common Law Claims

Defendants contend that Plaintiff's eighth count in the amended complaint, alleging state law claims of tortious interference with contract and prospective business relations, fails as a matter of law. (Defs. Mem. 99–109.)

In *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d at 233, the Second Circuit remanded Plaintiff's common law claims, and this Court subsequently accepted supplemental jurisdiction without specifically ruling on the merits those claims. Rather, upon remand, this Court focused upon Plaintiff's claims arising out of Title VII and NYSHRL—in particular, whether Plaintiff raised a material issue of fact with regard to whether she was an employee of OLV. Indeed, the parties dedicated the

majority of their briefs to analyzing the employee-employer relationship on summary judgment. Defendants now seek a more detailed analysis of Plaintiff's common law tortious interference claims, which Plaintiff has maintained in *pro forma* fashion up to this point.

At the outset, Plaintiff did not address her claim of tortious interference with contract on summary judgment, and that claim is therefore deemed abandoned. *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing *Douglas v. Victor Capital Grp.*, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (collecting cases)).

■ With respect to her claim of tortious interference with business relations, Plaintiff must adequately allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir.2008). Additionally, "a claim for interference with advantageous business relationships must specify some particular, existing relationship through which plaintiff would have done business but for the allegedly tortious behavior." *Kramer v. Pollock–Krasner Found.*, 890 F.Supp. 250, 258 (S.D.N.Y.1995).

Defendants aver that Plaintiff's claim fails because of her inability to identify the specific prospective business relationship and her inability to demonstrate that but for Defendants' allegedly wrongful conduct, she would have entered into those potential business relationships. (Docket No. 139 at 103–109.)

██ Here, Plaintiff names three physicians whom she alleges stopped referring patients to her, and instead referred those patients to Moore as a result of the peer review proceedings initiated against Plaintiff at Moore's behest. (Docket No. 149 ¶¶ 556–59; Ex. 55, pp. 12–13.) There is at least some evidence of Moore's involvement with respect to those physicians' referral practices shifting away from Plaintiff. (Docket No. 147, Ex. C at 282–285.) Moreover, Plaintiff has raised a triable issue of fact as to whether the peer review process was brought against Plaintiff in bad faith and in a discriminatory manner. *But see Mahmud v. Kaufmann,* 358 Fed. Appx. 229 (2d Cir.2009) (unpublished opinion) ("As a general rule, unless a defendant's conduct amount[s] to a crime or an independent tort, not alleged here, it satisfies [the third element] only if it is engaged in for the sole purpose of inflicting intentional harm on the plaintiff.... Mahmud offers no evidence to support her claim that the disciplinary action instituted against her was a sham ....") (internal quotations and citations omitted). Finally, Plaintiff has established that between 1996 and 2000, her referrals from other physicians diminished and that her gastroenterology practice was significantly reduced during that time period. (Docket No. 149 ¶¶ 556–59.)

Because Plaintiff has established a triable issue of fact on her common law claim of tortious interference with prospective business relations, Defendants are not entitled to summary judgment on this claim.

### 9. Defendant Diaz–Ordaz

Defendant Diaz–Ordaz, who has adopted Defendants' motions and memoranda in support of summary judgment, makes a separate argument for dismissal apart from those arguments common to all Defendants. Specifically, he maintains that his affidavits and submissions establish that dismissal of Plaintiff's claims against him is appropriate because he was not involved in the harassment alleged in the amended complaint. Rather, his participation was limited to reviewing Plaintiff's medical practice as part of the QA Program. (Docket No. 170 ¶¶ 6, 13–18.)

Based on this Court's determination that the individual Defendants, including Diaz–Ordaz, may be found liable after a trial under the "aider and abettor" theory of NYSHRL, Diaz–Ordaz has raised no ground justifying reconsideration of this Court's previous Decision and Order denying summary judgment with respect to him specifically.

### IV. CONCLUSION

After a review of those arguments not specifically discussed in its previous Decision and Order, this Court reiterates that summary judgment is inappropriate. As a result, Defendants have not demonstrated the extraordinary circumstances necessary for reconsideration.

A trial date will be set to decide: (1) whether Plaintiff was an employee of OLV for purposes of Title VII; and, if so, (2) whether Plaintiff was discriminated against and/or harassed by Defendants in violation of Title VII and NYSHRL; and (3) whether Defendants tortiously interfered with her contracts and prospective business relations. However, as this Court has previously suggested, the parties are urged to consider mediation to resolve this case.[2]

---

2. *See, e.g., Manual for Complex Litigation* Second § 23.11(1985) ("Many more cases are concluded by settlement than by trial. This reflects the fact that most lawyers and litigants prefer a negotiated solution to the costs, time, and uncertainty inherent in trial. Because both the expense and risk of loss are

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' motions for reconsideration (Docket Nos. 169, 175, 176) are DENIED.

FURTHER, the parties shall appear before this Court on July 24, 2012 at 9:00 a.m. for a status conference to set a trial date.

SO ORDERED.

magnified in complex cases, such actions are even more amenable to compromise than routine cases . . . .")